UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

DOROTHY ROGERS on behalf of          CIVIL ACTION NO. 6:20-cv-00488
RANDALL A. ROGERS (DECEASED)

VERSUS                               JUDGE SUMMERHAYS

COMMISSIONER OF THE SOCIAL           MAGISTRATE JUDGE HANNA
SECURITY ADMINISTRATION

## REPORT AND RECOMMENDATION

Before the Court is an appeal of the Commissioner's finding of non-disability. Considering the administrative record, the parties' briefs, and the applicable law, it is recommended that the Commissioner's decision should be reversed and remanded to the Commissioner for further administrative action.

## Administrative Proceedings

The claimant, Randall A. Rogers, fully exhausted his administrative remedies before this action was filed.  Mr. Rogers filed applications for disability insurance benefits and supplemental security income benefits, alleging disability beginning on May 17, 2014.[1]  His applications were denied.[2]  He then requested a hearing, which

---

[1]    Rec. Doc. 13-1 at 159, 170.

[2]    Rec. Doc. 13-1 at 68, 69.

was held in February 2019 before Administrative Law Judge Carolyn Smilie.[3]  At the hearing, the alleged disability onset date was changed to January 1, 2018.[4]  The ALJ issued a decision in April 2019, concluding that Mr. Rogers was not disabled within the meaning of the Social Security Act from January 1, 2018 through the date of the decision.[5]  Mr. Rogers asked the Appeals Council to review the ALJ's decision, but the Appeals Council found no basis for review.[6]  Accordingly, the ALJ's decision became the final decision of the Commissioner for the purpose of judicial review.[7]

## Summary of Pertinent Facts

The claimant's father, Raoul Rogers, Jr., initiated this action, acting pursuant to a power of attorney.[8]  After the claimant's death in June 2020, his widow, Dorothy A. Rogers, was substituted as the plaintiff/appellant in this lawsuit.[9]  Mrs. Rogers now seeks reversal of the Commissioner's adverse ruling.

---

[3]    Rec. Doc. 13-1 at 34-67.

[4]    Rec. Doc 13-1 at 51-52.

[5]    Rec. Doc. 13-1 at 25-26.

[6]    Rec. Doc. 13-1 at 5.

[7]    *Higginbotham v. Barnhart*, 405 F.3d 332, 336 (5th Cir. 2005).

[8]    Rec. Doc. 1.

[9]    Rec. Doc. 12.

The claimant, Randall A. Rogers was born on March 20, 1977,[10] and was 42 years old at the time of the ALJ's decision.  He had an eighth grade education[11] and worked as a construction welder at a sugar mill, as a welder and fitter for oilfield service companies, and as an oiler for an oilfield diving service.[12]  He also worked at a sugar mill during the harvest season.[13]  He alleged that he became disabled on January 1, 2018[14] due to cerebral palsy, blindness in one eye, strokes, and tripping.[15]

While hospitalized at Iberia Medical Center in New Iberia, Louisiana, in April 2014, Mr. Rogers was diagnosed with new onset seizures.[16]  He had a history of cerebral palsy, an old cerebrovascular accident ("CVA") or stroke, and polycythemia (a blood disease).  He was to follow up with a neurologist.  However, the record contains no evidence that Mr. Rogers ever saw a neurologist.

Mr. Rogers was admitted to Iberia Medical Center on May 18, 2014.[17]  He reported that, the day before, he noticed mild blurring of his vision then experienced

---

[10]    Rec. Doc. 13-1 at 47.

[11]    Rec. Doc. 13-1 at 47.

[12]    Rec. Doc. 13-1 at 47-50, 207.

[13]    Rec. Doc. 13-1 at 58, 60.

[14]    Rec. Doc. 13-1 at 51-52.

[15]    Rec. Doc. 13-1 at 71.

[16]    Rec. Doc. 13-1 at 363.

[17]    Rec. Doc. 13-1 at 343-349, 358-362.

a five-minute episode of generalized shaking without a loss of consciousness. A CT scan showed a possible subacute CVA. It was noted that he had a history of mild cerebral palsy manifested by mild left eye weakness as well as left upper and lower extremity weakness. He was diagnosed with erythrocytosis, a condition in which the body makes too many red blood cells.[18] A CT of Mr. Rogers's head showed evidence of an old stroke, evidence of a possible recent stroke, and mild to moderate shrinkage of the brain that was worse than expected for a person of his age. An MRI of his brain also showed evidence of an old stroke and diffuse cortical atrophy that was advanced for his age.

In 2016 and 2017, Mr. Rogers was seen in the emergency room at Abbeville General Hospital on five occasions for illnesses that were unrelated to the impairments underlying his claimed disability. During those visits, he reported a history of CVA and further reported that he was taking Plavix (used to lower the risk of having a stroke[19]), had stopped taking Keppra (an anticonvulsant medication[20]), had not seen a neurologist, and was not having seizures.

---

[18]    Healthline.com, https://www.healthline.com/health/erythrocytosis#:~:text=Erythrocytosis%20is%20a%20condition%20in,blood%20clots%20and%20other%20complications (last visited Mar. 2, 2021).

[19]    Drugs.com, https://www.drugs.com/Plavix (last visited March 8, 2021).

[20]    Drugs.com, https://www.drugs.com/Keppra (last visited March 8, 2021).

In his March 30, 2017 function report,[21] Mr. Rogers stated that he tended to drop things with his left hand and to trip over his feet because he had "a very bad limp." He stated that it was difficult for him to put on his socks and pants and to get in and out of the bathtub. He stated that he could cook complete meals with several courses, wash dishes, do laundry, sweep, and mow the grass with a riding mower. He estimated that he could lift forty pounds but could not squat, bend, kneel, or stand for long periods of time. He stated that he could not see out of his left eye, had difficulty climbing stairs, and had difficulty holding things in his left hand.

On May 5, 2017, Mr. Rogers was examined by Dr. Ira Markowitz at the request of the Louisiana state disability office.[22] Mr. Rogers reported that he was taking Plavix and Keppra. He denied having chest pain in the previous six months, but reported a history of chronic obstructive pulmonary disease, dyspnea on exertion, fatigue, and cerebral palsy. He complained of pain and difficulty in his right shoulder, left knee, and cervical vertebrae. Mr. Rogers told Dr. Markowitz that he had been laid off from his job as a crawfisherman. He reported that he was not able to drive, had difficulty standing up for five to fifteen minutes, could climb only one flight of stairs, and was unable to take care of a yard or do household chores.

---

[21]    Rec. Doc. 13-1 at 233-240.

[22]    Rec. Doc. 13-1 at 334-341.

He reported a hospitalization in 2015 for a stroke, but the record contains no evidence of any such hospitalization.

Dr. Markowitz observed that Mr. Rogers had difficulty getting on and off the examination table and ambulated with difficulty, although he was able to walk with an assistive device. According to Dr. Markowitz, Mr. Rogers's gait was abnormal and both markedly neuropathic and myopathic. Testing by Dr. Markowitz showed that the vision in Mr. Roger's left eye was worse than in his right eye, but was grossly normal; thus, Mr. Rogers was not blind in his left eye, as he claimed. Sitting and supine straight leg raise tests were positive in both legs. Mr. Rogers was not able to walk on his heels, had difficulty squatting, had difficulty doing a tandem heel walk, and had difficulty bending over and touching his toes. He had normal grip strength in his right hand but difficulty gripping with his left hand as well as decreased grip strength in his left hand. He had difficulty with both fine and gross manipulative skills in his left hand. His left leg was also weaker than his right leg and he lacked a full range of motion in his extremities.

In Dr. Markowitz's opinion, Mr. Rogers was able to stand and walk occasionally (very little up to 1/3 of an eight hour day), sit frequently (1/3 to 2/3 of an eight hour day), and had a limited ability to bend, stoop, reach, handle, or grasp. He opined that Mr. Rogers could lift and carry less than five pounds occasionally

with either hand.  He also noted that while Mr. Rogers had difficulty walking, he did not require an assistive device to aid in ambulation.

On October 3, 2017, Mr. Rogers had a follow up visit at Abbeville General Hospital with nurse practitioner Catherine Boutte.[23]  She noted a history of CVA and epilepsy.  She also noted that Mr. Rogers was seeing a neurologist, was compliant with medications, had experienced no recent seizures, was doing well, and had no other complaints.  Upon examination, Ms. Boutte noted no motor or sensory deficits.  Her impressions were epilepsy and adult health examination.  His Keppra was refilled, and he was to return in six months.

Mr. Rogers again saw Ms. Boutte on April 30, 2018.[24]  He reported that he had stopped taking Keppra the previous November due to dizziness and stated that the dizziness resolved a few days after he discontinued the medication.  He denied having any more seizures but reported recent dizziness and falls.  He was supposed to see a neurologist but had missed his appointment.  He was walking with a cane and requested a wheelchair.  However, Ms. Boutte found this was "confusing" since she thought Mr. Rogers drove a truck for a sugar cane farmer from time to time and "appears to be functionable."  There is no indication in the record that a physician recommended or prescribed a cane for Mr. Rogers.  Mr. Rogers reported having had

---

[23]      Rec. Doc. 13-1 at 380-383.

[24]      Rec. Doc. 13-1 at 384-389.

cerebral palsy from childhood, but Ms. Boutte noted that she could not find a record of this in his past medical records. Mr. Rogers reported that he was taking Plavix as prescribed. Ms. Boutte's assessments were orthostatic dizziness, seizure disorder, CVA, and smoking. She recommended a cardiac evaluation.

Mr. Rogers saw cardiologist Dr. Syed Fazal on May 10, 2018 because Nurse Boutte had obtained an EKG that showed septal infarct.[25] Mr. Rogers complained to Dr. Fazal of dizziness, fatigue, and shortness of breath, but denied having more seizures or passing out. Dr. Fazal noted that Mr. Rogers's left side was partially paralyzed from a stroke, preventing him from walking on a treadmill and that he walked with a cane. Dr. Fazal planned a pharmacological cardiac MRI stress test, an echocardiogram, and a carotid doppler test. He prescribed Lipitor.

On May 29, 2018, Mr. Rogers saw Dr. Claude Meeks to establish a primary health care relationship.[26] Mr. Rogers reported a history of CVA and "thick blood." He stated that he had stopped taking Keppra the previous November but was having problems with falling and bowel incontinence. His wife was concerned about him staying home with their small children while she was working, and she requested home health care assistance. Mr. Rogers indicated that he was unable to drive, walked with a cane, and required assistance getting from bed to a chair, getting to

---

[25]    Rec. Doc. 13-1 at 409-414.

[26]    Rec. Doc. 13-1 at 422-424, 425.

the toilet, getting dressed, showering, taking his medications, and climbing stairs. He gave a history including a stroke in 2011, seizure, unsteady gait, cerebral palsy, and a blood disorder.  Dr. Meeks observed that Mr. Rogers's gait with the cane was unsteady.  Upon examination, Dr. Meeks found that Mr. Rogers's strength in his upper and lower right side was 5/5 but 4/5 on the left and his reflexes were asymmetrical and hyperactive on the left knee.  Dr. Meeks ordered blood work, an abdominal x-ray, and an MRI of Mr. Rogers's brain.

On June 6, 2018, Mr. Rogers saw a different cardiologist, Dr. Raghotham Reddy Patlola.[27]    Mr. Rogers reported an abnormal EKG, recurrent transient ischemic attacks ("TIAs"), and complained of tingling and numbness in his arm.  Dr. Patlola recommended further cardiac testing.

Mr. Rogers returned to Dr. Meeks on June 19, 2018 to get his test results.[28] The MRI of his brain revealed generalized atrophy disproportionate to his age as well as evidence of multiple prior ischemic insults suggesting chronic microvascular ischemia.  He was reportedly experiencing an increasing loss of strength in his left side.  He was using a walker to ambulate.  A CT angiogram of his brain was ordered, and he was referred to home health and home physical therapy.

---

[27]    Rec. Doc. 13-1 at 395-399.

[28]    Rec. Doc. 13-1 at 421-422.

On August 2, 2018, Mr. Rogers again saw Dr. Meeks.[29]  The CT angiogram showed chronic findings but nothing acute.  It was noted that he had weakness of his left leg since childhood, a history of embolic stroke with deficits, and cerebral palsy.  His Plavix prescription was continued.

Mr. Rogers saw Dr. Meeks again on October 9, 2018.[30]  He was doing well since his last visit.  He had used home health for approximately one month but was discharged from their services.  A neurology referral was pending.  He was walking with a rolling walker.  He reported no recent falls, and his Plavix was refilled.

On February 1, 2019, Mr. Rogers testified at a hearing.  He stated that he was disabled because he could not walk without using a rolling walker.  He stated that he had cerebral palsy and that his left hand was weaker than his right hand.  He confirmed that he is right-handed and estimated that he could carry a gallon of milk in his right hand but not in his left hand.  He stated that he could write, turn a doorknob, and pick buttons up off a table with his right hand.  He testified that his legs were weak and that he had fallen at least six times in the previous three months.  He denied having trouble getting dressed or tying his shoelaces.  He stated that he lived with his parents, that they supported him financially, and that his father did all

---

[29]     Rec. Doc. 13-1 at 421.

[30]     Rec. Doc. 13-1 at 420-421.

the cooking. He denied being able to drive but stated that no doctor had restricted him from driving.

Mr. Rogers stated that he did not know what type of problem he had with his left eye except that he had to close his right eye to be able to see with his left eye. Then he stated that he could not see out of his left eye at all. He also stated that he was told that glasses would not help his vision. However, there is no medical evidence in the record supporting that statement.

Mr. Rogers testified that he was taking Plavix with no side effects.

Mr. Rogers testified that he had previously worked as a welder, oiler, and fitter, but he denied that he had ever driven sugar cane trucks. He also testified that he had done seasonal work at a sugar mill during the harvest season but was denied employment when he last applied due to his difficulty walking.

## **Analysis**

### A.    **Standard of Review**

Judicial review of the Commissioner's denial of disability benefits is limited to determining whether substantial evidence supports the decision and whether the proper legal standards were used in evaluating the evidence.[31] "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as

---

[31]     *Villa v. Sullivan*, 895 F.2d 1019, 1021 (5th Cir. 1990); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995).

a reasonable mind might accept as adequate to support a conclusion."[32]   If the Commissioner's findings are supported by substantial evidence, they are conclusive and must be affirmed.[33]   In reviewing the Commissioner's findings, a court must examine the entire record, but cannot reweigh the evidence or substitute its judgment for that of the Commissioner.[34]   Conflicts in the evidence[35] and credibility assessments[36] are for the Commissioner to resolve, not the courts.  Four elements of proof are weighed by the courts in determining if substantial evidence supports the Commissioner's determination:   (1) objective medical facts, (2) diagnoses and opinions of treating and examining physicians, (3) the claimant's subjective evidence of pain and disability, and (4) the claimant's age, education and work experience.[37]

## B.    <u>**Entitlement to Benefits**</u>

The disability insurance benefits program provides income to individuals who are forced into involuntary, premature retirement, provided they are both insured and disabled, regardless of indigence,[38] while the supplemental security income program

---

[32]    *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

[33]    42 U.S.C. § 405(g); *Martinez v. Chater*, 64 F.3d at 173.

[34]    *Hollis v. Bowen*, 837 F.2d 1378, 1383 (5th Cir. 1988); *Villa v. Sullivan*, 895 F.2d at 1022.

[35]    *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir. 1985).

[36]    *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991).

[37]    *Wren v. Sullivan*, 925 F.2d at 126.

[38]    See 42 U.S.C. § 423(a).  See, also, *Smith v. Berryhill*, 139 S.Ct. 1865, 1772 (2019).

12

provides income to individuals who are disabled and meet certain income and resource requirements.[39]

A person is disabled "if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."[40]  A claimant is disabled only if his physical or mental impairment or impairments are so severe that he is unable to not only do his previous work, but cannot, considering his age, education, and work experience, participate in any other kind of substantial gainful work which exists in significant numbers in the national economy, regardless of whether such work exists in the area in which the claimant lives, whether a specific job vacancy exists, or whether the claimant would be hired if he applied for work.[41]

## C.    **Evaluation Process and Burden of Proof**

A sequential five-step inquiry is used to determine whether a claimant is disabled, which considers whether the claimant (1) is currently engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment

---

[39]    42 U.S.C. § 1382(a)(1) & (2).  See, also, *Smith v. Berryhill*, 139 S.Ct. at 1772.

[40]    42 U.S.C. § 1382c(a)(3)(A).

[41]    42 U.S.C. § 1382c(a)(3)(B).

enumerated in the relevant regulations; (4) is able to do the kind of work he did in the past; and (5) can perform any other work.[42]

Before going from step three to step four, the Commissioner evaluates the claimant's residual functional capacity[43] by determining the most the claimant can still do despite his physical and mental limitations based on all relevant evidence in the record.[44] The claimant's residual functional capacity is used at the fourth step to determine if he can still do his past relevant work and at the fifth step to determine whether he can adjust to any other type of work.[45]

The claimant bears the burden of proof on the first four steps; at the fifth step, however, the Commissioner bears the burden of showing that the claimant can perform other substantial work in the national economy.[46] This burden may be satisfied by reference to the Medical-Vocational Guidelines of the regulations, by expert vocational testimony, or by other similar evidence.[47] If the Commissioner makes the necessary showing at step five, the burden shifts back to the claimant to

---

[42]    20 C.F.R. § 404.1520; *Garcia v. Berryhill*, 880 F.3d 700, 704 (5th Cir. 2018).

[43]    20 C.F.R. § 404.1520(a)(4).

[44]    20 C.F.R. § 404.1545(a)(1).

[45]    20 C.F.R. § 404.1520(e).

[46]    *Graves v. Colvin*, 837 F.3d 589, 592 (5th Cir. 2016); *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994).

[47]    *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).

rebut this finding.[48]  If the Commissioner determines that the claimant is disabled or not disabled at any step, the analysis ends.[49]

## D.    <u>The ALJ's Findings and Conclusions</u>

In this case, the ALJ determined, at step one, that the claimant has not engaged in substantial gainful activity since January 1, 2018.[50]  This finding is supported by substantial evidence in the record.

At step two, the ALJ found that the claimant has the following severe impairments:  residual effects of cerebral palsy, residual effects of cerebrovascular accident, obesity, and seizure disorder.[51]  This finding is supported by substantial evidence in the record.

At step three, the ALJ found that the claimant has no impairment or combination of impairments that meets or medically equals the severity of a listed impairment.[52]  This finding was challenged.

The ALJ found that Mr. Rogers had the residual functional capacity to perform sedentary work with the following limitations:  never push/pull foot controls

---

[48]    *Perez v. Barnhart*, 415 F.3d 457, 461 (5th Cir. 2005); *Fraga v. Bowen*, 810 F.2d at 1302.

[49]    20 C.F.R. § 404.1520(a)(4); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994), cert. den. 914 U.S. 1120 (1995) (quoting *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987)).

[50]    Rec. Doc. 13-1 at 20.

[51]    Rec. Doc. 13-1 at 20.

[52]    Rec. Doc. 13-1 at 21.

on the left; occasionally push/pull hand controls on the left; occasionally handle and finger on the left; occasionally climb ramps/stairs but never climb ladders, ropes, or scaffolds; occasionally balance, stoop, and crouch but never kneel or crawl; never be exposed to unprotected heights, moving mechanical parts, or operating a motor vehicle; and needs to be able to use a one-handed assistive device for ambulation.[53] This finding was challenged.

At step four, the ALJ found that Mr. Rogers was not capable of performing any past relevant work.[54]  This finding was not challenged.

At step five, the ALJ found that Mr. Rogers was not disabled from January 1, 2018 through April 24, 2019 (the date of the decision) because there were jobs in the national economy that he could have performed.[55]  This finding was challenged.

### E.    <u>The Allegations of Error</u>

The claimant contends that the ALJ erred (1) in reaching a residual functional capacity assessment that was not supported by substantial evidence because Dr. Markowitz's opinions were improperly weighed; and (2) by failing to properly evaluate whether Mr. Rogers's impairments met or medically equaled Listing 11.04.

---

[53]    Rec. Doc. 13-1 at 21.

[54]    Rec. Doc. 13-1 at 24.

[55]    Rec. Doc. 13-1 at 24.

**F.    Did the ALJ Err in Weighing Dr. Markowitz's Opinions and Evaluating Mr. Rogers's Residual Functional Capacity?**

Mrs. Rogers argued that the ALJ failed to properly weigh Dr. Markowitz's opinions and consequently reached a residual functional capacity finding that was not supported by substantial evidence.  A residual functional capacity assessment determines the most the claimant can still do despite his limitations.[56]  The ALJ is responsible for determining the claimant's residual functional capacity.[57]  To make a finding in that regard, the ALJ must consider all of the evidence in the record, evaluate the medical opinions in light of other information contained in the record, and determine the plaintiff's ability despite any physical or mental limitations.[58]

The Social Security regulations require the ALJ to evaluate every medical opinion in the record and decide how much weight should be assigned to each.[59] Generally, more weight should be accorded to the medical opinions of a source who examined the claimant than to a source that did not do so,[60] and at the time that Mr. Rogers's application was filed, treating physicians were entitled to controlling

---

[56]    *Perez v. Barnhart*, 415 F.3d at 462 (citing 20 C.F.R. § 404.1545(a)(1)).

[57]    *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).

[58]    *Martinez v. Chater*, 64 F.3d at 176.

[59]    20 C.F.R. § 404.1527(c).

[60]    20 C.F.R. § 404.1527(c)(1).

17

weight.[61]   Dr. Markowitz was not Mr. Rogers's treating physician; therefore, his opinions are not entitled to controlling weight.   However, Dr. Markowitz did examine Mr. Rogers; therefore, it is arguable that his opinions are entitled to greater weight than those of the nonexamining medical sources.

The ALJ credited Dr. Markowitz's opinion that Mr. Rogers was restricted to a limited range of sedentary work but stated that she gave his opinions only partial weight because she found that Mr. Rogers had greater postural and manipulative limitations than recognized by Dr. Markowitz, including the need for an assistive device for ambulation.   Mrs. Rogers criticized the ALJ for mentioning in the ruling Dr. Markowitz's opinion that Mr. Rogers could lift and carry less than five pounds with either hand on an occasional basis but failing to adopt that opinion or explain why it was not adopted.   When an ALJ rejects a medical opinion but does not explain why and the claimant is prejudiced, remand is appropriate for an explanation of the rejected medical opinion or an explanation of what weight was assigned.[62]

In this case, the ALJ's failure to explain why she did not accept Dr. Markowitz's opinion that Mr. Rogers had significant strength deficits in both hands was harmless error.   In the Fifth Circuit, an error is harmless when it is inconceivable

---

[61]    See 20 C.F.R. § 404.1520c; 20 C.F.R. § 404.1527 ("For claims filed. . . before March 27, 2017, the rules in this section apply. For claims filed on or after March 27, 2017, the rules in § 404.1520c apply.").

[62]    *Kneeland v. Berryhill*, 850 F.3d 749, 761 (5th Cir. 2017).

18

that a different administration conclusion would have been reached absent the error.[63]  Here, Dr. Markowitz did not opine that Mr. Rogers was unable to work at all.  Therefore, even adopting each and every individual opinion set forth in Dr. Markowitz's report would not have required the ALJ to find that Mr. Rogers was disabled.  Dr. Markowitz's report was also internally inconsistent on the specific issue of Mr. Rogers's ability to lift and carry.  He found that Mr. Rogers had normal grip strength and normal fine and gross manipulative skills in his right hand.  Therefore, his objective findings do not support his opinion that Mr. Rogers was unable to lift more than five pounds occasionally with his right hand.  Further, there is no other evidence in the record supporting the conclusion that Mr. Rogers's right hand was impaired in any way.  Thus, even if the ALJ had provided a more detailed explanation for the weight she assigned to Dr. Markowitz's opinions, she might conceivably have reached the same conclusion regarding Mr. Rogers's residual functional capacity.  Accordingly, the ALJ's assignment of partial weight to Dr. Markowitz's opinions without a more thorough explanation of her analysis of those opinions was a harmless error that does not require remand.

---

[63]      See *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003).

**G.    Did the ALJ Err in Evaluating Listing 11.04?**

Mrs. Rogers argued that the ALJ erred in concluding that Mr. Rogers's impairments did not meet or equal a listing.  In particular, Mrs. Rogers argued that the ALJ failed to properly evaluate whether Mr. Rogers's impairments satisfied the criteria of Listing 11.04, the listing for vascular insult to the brain.  In a conclusory fashion, the ALJ stated that she had "specifically considered the requirements of Section 4.00 and 11.00, *et seq*., of the Listing of Impairments" and that the claimant "failed to meet his burden of proof at this step of the process."[64]  While it is true that the claimant has the burden of proof at Step Three of the sequential analysis, this does not relieve the ALJ of her responsibilities.

An "ALJ is required to discuss the evidence and explain the basis for his findings at each unfavorable step of the sequential evaluation process."[65]  At Step Three, the ALJ must consider whether the claimant's impairments meet or equal the severity of a listed impairment.  To meet a listed impairment, the claimant's medical findings, i.e., symptoms, signs, and laboratory findings, must match all those described in the listing for that impairment.[66]  To equal a listing, the claimant's

---

[64]    Rec. Doc. 13-1 at 21.

[65]    *Williams v. Astrue*, No. 09-0130, 2010 WL 989216, at * 3 (W.D. La. Mar. 15, 2010), citing *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir. 2007), which in turn cites 42 U.S.C. § 405(b)(1).

[66]    20 C.F.R. §§ 404.1525(d); *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990).

unlisted impairment must be "at least equal in severity and duration to the criteria of any listed impairment."[67]    Therefore, "[t]he ALJ should identify the listed impairment for which the claimant's symptoms fail to qualify and provide an explanation as to how he or she determined that the symptoms are insufficiently severe to meet any listed impairment."[68]

In this case, however, the ALJ did not do so.  Instead, the ALJ simply stated that "[t]hough the claimant has severe physical impairments, none is severe enough to meet or medically equal one of the impairments listed in Appendix 1, Subpart P, Regulations No. 4."[69]  The ALJ did not identify the specific listings she considered, did not compare the criteria of any listing against the evidence in the record, and did not explain why the criteria of the listings were not satisfied.

However, "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected."[70]  The claimant must demonstrate that the ALJ's alleged error was prejudicial or, in other words, that it "cast into doubt the existence of

---

[67]    20 C.F.R. § 404.1526(a).

[68]    *Savoie v. Colvin*, No. 14-30-JJB-RLB, 2015 WL 1004217, at *5 (M.D. La. Mar. 5, 2015).

[69]    Rec. Doc. 13-1 at 21.

[70]    *Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

substantial evidence to support the ALJ's decision."[71]  As noted earlier, an error is harmless only when it is inconceivable that a different conclusion would have been reached absent the error.[72]

Here, the parties' briefing demonstrates that the ALJ's error was not harmless. Listing 11.04B requires evidence of "[d]isorganization of motor function in two extremities. . . resulting in an extreme limitation. . . in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities, persisting for at least 3 consecutive months after the insult. . . ."[73]  In her briefing, Mrs. Rogers cited to numerous instances in the record where the evidence supports the conclusion that these criteria were satisfied, while the Commissioner, in his briefing, cited to several different examples of evidence in the record supporting the opposite conclusion.  Therefore, Mr. Rogers's impairments might – or might not – have satisfied or equaled the criteria of Listing 11.04B.  In this case, then, the ALJ's failure to cite to medical evidence and give reasons for her decision at Step Three affected Mr. Rogers's substantial rights.  The ALJ failed to apply the proper legal standard, and this Court is unable to determine whether the ALJ's conclusion at Step

---

[71]    *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988); see also *Audler v. Astrue*, 501 F.3d at 448-49 (requiring the claimant to show prejudice from Step Three error).

[72]    *Frank v. Barnhart*, 326 F.3d at 622.

[73]    20 C.F.R. Pt. 404, Subpt. P, App. 1, Section 11.04B – Vascular insult to the brain.

Three is based on substantial evidence in the record.  Therefore, this matter should be remanded for an analysis of whether the claimant had an impairment or a combination of impairments that met or medically equaled a listed impairment.

### Conclusion and Recommendation

For the foregoing reasons, this Court recommends that the Commissioner's decision should be REVERSED and REMANDED to the Commissioner pursuant to the fourth sentence of 42 U.S.C. § 405(g) with instructions to determine whether Mr. Rogers's impairments met or medically equaled the criteria of Listing 11.04 or any other relevant listed impairment.  Inasmuch as the reversal and remand recommended herein falls under sentence four of Section 405(g), any judgment entered in connection herewith will be a "final judgment" for purposes of the Equal Access to Justice Act.[74]

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen days from receipt of this report and recommendation to file specific, written objections with the Clerk of Court.  A party may respond to another party's objections within fourteen days after receipt of a copy of any objections or responses to the district judge at the time of filing.

---

[74]    See, *Richard v. Sullivan*, 955 F.2d 354 (5th Cir. 1992), and *Shalala v. Schaefer*, 509 U.S. 292 (1993).

Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in the report and recommendation within fourteen days following the date of receipt, or within the time frame authorized by Fed. R. Civ. P. 6(b) shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the district court, except upon grounds of plain error.[75]

Signed in Lafayette, Louisiana, this 9th day of March 2021.

_____
PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

---

[75]    See *Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996) (en banc), superseded by statute on other grounds, 28 U.S.C. § 636(b)(1).